**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**VHS ACQUISITION SUBSIDIARY NO. 7,**

　　　　　Plaintiff,

　　　　v.

**NATIONAL LABOR RELATIONS
BOARD**, *et al.*

　　　　　Defendants.

---

Case No. 1:24-cv-02577 (TNM)

## <u>MEMORANDUM OPINION</u>

The National Labor Relations Board has charged a Massachusetts hospital with violations of federal law. But the NLRB delegated adjudication of this matter to one of its many administrative law judges. Like all NLRB ALJs, this officer enjoys multiple levels of protection from presidential removal. The hospital now claims that these tenure protections are unconstitutional.

The hospital is correct. Recent Supreme Court caselaw teaches that ALJs are "officers of the United States," that is, they wield significant discretionary executive authority. If the President wished to remove this—or any—NLRB ALJ, he would have to prevail upon the NLRB board members, who themselves can only be removed for cause. And even if the Board agreed with him, they would have to prevail upon another board whose members are also protected by for-cause removal. And the NLRB could then only remove the errant ALJ for good cause, a finding that is reviewable in federal court. Needless to say, this byzantine process eviscerates the President's ability to control NLRB ALJs. Thus, the Court holds that these tenure protections are invalid under the Constitution.

**I.**

VHS Acquisition Subsidiary Number 7, doing business as Saint Vincent Hospital, is an acute-care hospital in Massachusetts. Pl.'s Mot. Summ. J., ECF No. 12, at 3. It employs many nurses who are represented by the Massachusetts Nurses Association ("the Union"). *Id.* Alleging several unfair labor practices, the Union filed a formal charge against Saint Vincent before the NLRB. *Id.* at 4. The NLRB subsequently charged Saint Vincent with violating various provisions of the National Labor Relations Act. *Id.* It tasked one of its ALJs with adjudicating the case. *Id.* at 5.

Days before that proceeding was to begin, Saint Vincent came to this Court asking for a temporary restraining order. It argued that the enforcement action violated the Constitution and that being forced to defend against it would subject the hospital to irreparable harm. Pl.'s Mot. TRO, ECF No. 3. After a hearing, the Court denied that request. Minute Order 09/10/2024. Saint Vincent then moved for injunctive relief and summary judgment. Pl.'s Mot. Summ. J., ECF No. 12. The Court found that it lacked authority to issue injunctive relief. *See VHS Acquisition Subsidiary No. 7 v. Nat. Lab. Relations Bd.*, 2024 WL 4817175, at *1 (D.D.C. Nov. 17, 2024). It also concluded it lacked subject matter jurisdiction over Saint Vincent's claims about the Seventh Amendment and separation of powers. *Id.* at *2–4.

That leaves one claim before the Court for resolution: Saint Vincent's motion for summary judgment as to the ALJ removal restrictions. Pl.'s Mot. Summ. J. at 8–16. Saint Vincent insists that the NLRB ALJs are unconstitutionally tenured, as they have at least two levels of job protection insulating them from presidential oversight. *See generally id.* ALJs are only removable by the NLRB "for good cause established and determined by the Merit Systems Protection Board [('MSPB')] on the record after opportunity for hearing before the [MSPB]." 5

U.S.C. § 7521(a).  MSPB officers, in turn, can only be dismissed by the President for "inefficiency, neglect of duty, or malfeasance in office."  5 U.S.C. § 1202(d).  And NLRB members can only be let go "for neglect of duty or malfeasance in office, but for no other cause."  29 U.S.C. § 153(a).  Such a structure, Saint Vincent claims, violates *Free Enterprise Fund v. Public Company Accounting Oversight Board*'s holding that "dual for-cause limitations" on the removal of inferior officers "contravene the Constitution's separation of powers."  561 U.S. 477, 492 (2010).

The NLRB cross-moves for summary judgment.  Defs.' Cross-Mot. Summ. J., ECF No. 16.  It argues that *Free Enterprise Fund* is not controlling, as its holding does not extend to the thousands of ALJs housed in the Executive Branch.  *Id.* at 10–11.  And it insists that the ALJs' "purely adjudicatory functions" and extensive oversight by the NLRB differentiates this case, too.  *Id.* at 11–14.  Thus, according to the NLRB, the ALJ removal restrictions are constitutional.

These motions are ripe for resolution.

## II.

To prevail on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Summary judgment is proper "when, viewing the evidence in the light most favorable to the non-movant and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in her favor."  *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016).

The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the dispute arises under the Constitution.  More, the Court has power to resolve the parties' legal

relationship and obligations under the Declaratory Judgment Act, 28 U.S.C. § 2201, because the

parties present a discrete controversy about the constitutional authority of the NLRB to proceed.

*See Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354,

1366 (D.C. Cir. 2023).

### III.

The NLRB's ALJs are unconstitutionally insulated from removal.

Start with the text, structure, and original meaning of the Constitution. Article II vests

the executive power in the President alone. U.S. Const. art. II, § 1. This decision to create a

unitary executive was not a mere mimicry of what the Framers already knew, or some half-baked

fallback on a default position. It resulted from significant forethought. Alexander Hamilton

stressed that unity was "conducive to energy," an essential quality for the leader of the new

nation. *The Federalist* No. 70, at 424 (Clinton Rossiter, ed., 1961) (hereinafter *The Federalist*).

He recognized that the alternative, a plural executive, would "tend[] to conceal faults and destroy

responsibility," depriving the electorate of its ability to check misconduct and runaway power

through public opinion. *Id.* at 427. Because "multiplication of the executive" was seen as more

"dangerous than friendly to liberty," the Federalists envisioned a vigorous, identifiable, and

accountable leader. *Id.* at 430. Even many of their antagonists in thought, the Antifederalists,

acknowledged the need for a lone executive. A leading Antifederalist voice argued that "a single

man seems to be peculiarly well circumstanced to superintend the execution of laws with

discernment and decision, with promptitude and uniformity." 14 Federal Farmer, *reprinted in* 2

*The Complete Anti-Federalist* 307, 310 (Herbert J. Storing, ed., 1981).

But the Framers knew that no one person could do the job without help. They knew that

the President would need trusted advisors to help shape and run the nascent republic. *See Myers*

*v. United States*, 272 U.S. 52, 117 (1926) ("The vesting of the executive power in the President was essentially a grant of the power to execute the laws.  But the President alone and unaided could not execute the laws.  He must execute them by the assistance of subordinates.").  Yet this practical necessity could pose dangers.  Hamilton warned that "unity could be destroyed . . . by vesting it ostensibly in one man, subject, in whole or in part, to the control and cooperation of others, in the capacity of counselors to him."  *The Federalist* No. 70 at424.  Safeguards needed to be put in place to ensure the executive was not trodden over by those supposedly accountable to him.

Enter Article II.  By imbuing one official with "*the* executive power," and charging him with "tak[ing] Care that the Laws be faithfully executed," the Framers afforded the President all the necessary incidents to that power.  U.S. Const. art. II, §§ 1, 3 (emphasis added); *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020).  The authority of the President to remove subordinates at pleasure is derivative of the executive power.  The Framers understood it to be the chief way the executive could adequately control and direct his officers.  *Documentary History of the First Federal Congress of the United States of America, March 4, 1789–March 3, 1791—Debates II*, 925 (De Pauw et al., eds. 1972) (statement of J. Madison) (noting that a plenary removal power "preserve[s]" "the chain of dependence," as "the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community.").

The removal right's inherency to the executive power stretches its roots back to England. There the Crown set official tenures for its subordinates.  Aditya Bamzai & Saikrishna Prakash, *The Executive Power of Removal*, 136 Harv. L. Rev. 1756, 1768 (2023); *Myers*, 272 U.S. at 118 ("In the British system, the crown, which was the executive, had the power of appointment and

removal of executive officers, and it was natural, therefore, for those who framed our Constitution to regard the words 'executive power' as including both."). Unlike senior judges who held their offices *quamdiu bene se gesserint* [during their good behavior], royal officers who executed the law held their offices "only during [the king's] pleasure." William Blackstone, 1 *Commentaries on the Laws of England* 226 (Wilfrid Prest ed., 2016) (justices of the peace); *see also id.* at 219 (sheriffs); *but see id.* at 172 (high court judges). The "Great Officers of the State" and members of the Privy Council also served at the pleasure of the Crown. Michael W. McConnell, *The President Who Would Not Be King* 162 (2020) (citing 10 William Holdsworth, *A History of English Law* 418, 453 (photo. reprint 1966) (1938)). This practice carried overseas to the original colonies, where colonial governors had the authority to appoint and remove subordinates. Bamzai & Prakash, 136 Harv. L. Rev. at 1769. Early state constitutions followed suit, expressly granting appointment and removal powers to their governors or incorporating them through broader grants of executive power. *Id.*; *see, e.g.*, *A Report of the Committee of the Council of Censors* 22 (Philadelphia, Francis Bailey 1784).

One of the earliest congressional debates confirmed that the removal power was constitutionally conferred. In the renowned Decision of 1789, Congress "engaged in one of the nation's most exhaustive, erudite, and edifying constitutional debates" over the removal question. Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021, 1022–23 (2006). Congress ultimately concluded that the executive's power of removal was given not by the legislature but by the Constitution. *Id.* Rep. James Madison was one of the most ardent proponents of this notion, insisting that the ability to remove was "as much of an executive nature as" the power of appointment. *The Congressional Register* (June 17, 1789), *reprinted in Debates in the House of Representatives, First Session: June–September 1789*, 11

*Documentary History of the First Federal Congress*, 1789–1791, at 869 (Charlene Bangs Bickford et al. eds., 1992). Madison's colleagues also defended the proposition with zeal. *See id.* at 866 ("As the nature of the government requires the power of removal, I think it is to be exercised in this way by a hand capable of exerting itself with effect, and the power must be conferred upon the president by the constitution.") (statement of Rep. Sedgwick); 2 George Bancroft, *History of the Constitution of the United States* 192 (1883) ("'He shall take care that the laws be faithfully executed' are sweeping words. . . . To turn a man out of office is an exercise of neither legislative nor of judicial power; it is like a tree growing upon land that has been granted.") (statement of Sen. Ellsworth).

Later prominent legal scholars would describe the Decision of 1789 as confirming that Article II imparted a power to remove to the President. *See* 5 John Marshall, *The Life of George Washington* 197–99 (Philadelphia, C.P. Wayne 1807). This Decision "provides contemporaneous and weighty evidence of the Constitution's meaning since many of the Members of the First Congress had taken part in framing that instrument." *Bowsher v. Synar*, 478 U.S. 714, 723–724 (1986) (cleaned up).

While the question of the source and vessel of the removal power was settled in 1789, questions remained about its indefeasibility. That is, could Congress restrict the President's right to remove his subordinates? Over the next two-hundred-plus years, the branches would spar over the pliability of the background rule. *See* Jeff Shesol, *Supreme Power: Franklin Roosevelt vs. The Supreme Court* 144 (2011) (describing controversy over President Franklin D.

Roosevelt's frustrated plan to remove the head of the Federal Trade Commission).  The Supreme Court has recognized two caveats to the President's plenary removal authority.

First, Congress can limit the President's ability to remove inferior officers who are themselves removable by principal officers.  In *United States v. Perkins*, 116 U.S. 483, 485 (1886), the Court upheld tenure protections for a naval cadet-engineer, an inferior officer who was appointed by the Secretary of the Navy.  Similarly, in *Morrison v. Olson*, the Court upheld for-cause removal restrictions for an independent counsel, an inferior officer appointed by the Attorney General.  487 U.S. 654, 660 (1988).  *Morrison* emphasized that the tenure protections did not "unduly trammel[] on executive branch authority," as the counsel was "an inferior officer," had "limited jurisdiction," and "lack[ed] policymaking or significant administrative authority."  *Id.* at 691; *see also Seila Law*, 591 U.S. at 204 (describing *Perkins* and *Morrison* as upholding removal restrictions for "inferior officers with limited duties and no policymaking or administrative authority.").

Second, in *Humphrey's Executor v. United States*, the Court concluded that the President's "illimitable power of removal" did not extend to multimember boards leading "quasi legislative or quasi judicial agencies."  295 U.S. 602, 629 (1935); *see also Seila Law*, 591 U.S. at 216 ("*Humphrey's Executor* permitted Congress to give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was not said to exercise any executive power.")  Because these officers needed to "discharge [] their duties independently of executive control," the Court held that Congress could forbid their removal save for cause.  *Humphrey's Ex'r*, 295 U.S. at 629; *see also*

*Wiener v. United States*, 357 U.S. 349, 356 (1958) (upholding removal restrictions for the War Claims Commission, a multimember "adjudicatory body.").

To paraphrase, the Court has carved out two exceptions to the President's removal power: First, Congress can limit the President's ability to remove inferior officers with circumscribed duties and no policymaking authority. And second, Congress can grant tenure protection to bipartisan, multimember boards who perform legislative- or judicial-like functions. These two exceptions "represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 698 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), *rev'd in part*, 561 U.S. 477 (2010). Both of these judicially created limitations have faced substantial criticisms on originalism grounds—*see, e.g.*, Geoffrey P. Miller, *Independent Agencies*, 1986 Sup. Ct. Rev. 41, 93 (1986); McConnell, *supra*, at 167–69—but even this existing caselaw dooms the NLRB's ALJ tenure protections.

In *Free Enterprise Fund v. Public Company Accounting Oversight Board*, the Supreme Court faced a fusion of these two exemptions. 561 U.S. 477 (2010). The case concerned the Public Company Accounting Oversight Board ("PCAOB"), a board comprised of five members appointed by the Securities and Exchange Commission. *Id.* at 484. At the time, the SEC could only remove PCAOB members "for good cause shown," "in accordance" with specific procedures. *Id.* at 486. The SEC Commissioners are also insulated from removal; they can only be fired if the President finds "inefficiency, neglect of duty, or malfeasance in office." *Id.* at 487. Thus the Court was asked to solve a novel predicament: "May the President be restricted in his ability to remove a principal officer, who is in turn restricted in his ability to remove an inferior officer, even though that inferior officer determines the policy and enforces the laws of the

United States?"  *Id.* at 483–84.  In short, could the exceptions recognized in *Humphrey's Executor* and *Morrison* be "combined"?  *Id.* at 483.

The *Free Enterprise Fund* Court said no.  *Id.* at 492.  It found that the stacked layers of tenure protection "result[ed] i[n] a Board that is not accountable to the President, and a President who is not responsible for the Board."  *Id.* at 495.  "Neither the President, nor anyone directly responsible to him, nor even an officer whose conduct he may review only for good cause, ha[d] full control over the Board."  *Id.* at 496.  The President was not "the judge of the [PCAOB's] conduct" or "the one who decide[d] whether [PCAOB] members [were] abusing their offices or neglecting their duties."  *Id.*  Such an arrangement was flagrantly "contrary to Article II's vesting of the executive power in the President," as the President could neither "ensure that the laws are faithfully executed, nor be held responsible for a Board member's breach of faith."  *Id.* at 496.  To the Court, the reality of two layers of removal restrictions was not merely a matter "elementary arithmetical logic."  *Id.* at 501 (quoting *id.* at 535 (Breyer, J., dissenting)).  Instead, it stressed that the PCAOB officers were "safely encased within a Matryoshka doll of tenure protections," rendering them "immune from Presidential oversight, even as they exercised power in the people's name."  *Id.* at 497.  In short, two protective layers was one too many.

So too here.  NLRB ALJs are cloaked in at least two—and arguably three—levels of tenure protection.  The NLRB may remove them "only for good cause established and determined by the [MSPB] on the record after opportunity for hearing before the [MSPB]."  5 U.S.C. § 7521(a).  The good cause determination is reviewable by the Federal Circuit.  28 U.S.C. § 1295(a)(9).  The NLRB members, in turn, can be removed only "for neglect of duty or

malfeasance in office, but for no other cause."  29 U.S.C. § 153(a).[1]  And the MPSB officers can

be dismissed only for "inefficiency, neglect of duty, or malfeasance in office."  5 U.S.C.

§ 1202(d).  Thus, if the President wanted to remove an ALJ, he would first have to convince the

NLRB.  Then, the NLRB would need to petition a different independent agency, the MSPB.

Next, the MPSB would have to find good cause and so inform the NLRB.  Finally, the NLRB

would have to choose to act on that finding.  *Jarkesy v. Sec. & Exch. Comm'n,* 34 F.4th 446, 465

(5th Cir. 2022), *aff'd and remanded on other grounds*, 144 S. Ct. 2117 (2024).  Like the stacked

tenure protections in *Free Enterprise Fund*, the present structure "not only protects [ALJs] from

removal except for good cause, but withdraws from the President any decision on whether that

good cause exists.  That decision is vested instead in other tenured officers . . . none of whom is

subject to the President's direct control."  *Free Enter. Fund*, 561 U.S. at 495.

This could result in federal officers pursuing unordained and perhaps unwise paths, with

the only fear of reprisal shrouded in a maze of red tape.  Such attenuation from accountability

was precisely what the Framers warned against when they rebuffed calls to fashion a plural

executive.  A labyrinth of tenured decisionmakers makes it "impossible" for the electorate "to

determine on whom the blame or the punishment of a pernicious measure, or a series of

pernicious measures, ought really to fall."  *The Federalist* No. 70, at 428.  And it permits

endlessly prismatic finger-pointing, offering wayward technocrats the ability to "clothe the

circumstances with so much ambiguity" that no citizen could ever find the right party to hold

responsible.  *Id.*  This, despite the Framers' insistence that "[t]he people are the only legitimate

fountain of power, and it is from them that the constitutional charter, under which the several

---

[1] Saint Vincent does not argue that the NLRB members are unconstitutionally insulated from removal, so the Court assumes that their tenure satisfies the *Humphrey's Executor* exception.  *See* Not. Voluntary Dismissal, ECF No. 11 (voluntarily dismissing claim that NLRB members were unconstitutionally protected from removal).

branches of government hold their power, is derived." *The Federalist* No. 49, at 313–14 (James Madison).  To uphold the present removal restrictions would offend these axiomatic principles.

The NLRB insists that ALJs are sufficiently distinguishable from the PCAOB members in *Free Enterprise Fund*.  It stresses that *Free Enterprise Fund* took pains to carve out ALJs from its purview because of their adjudicatory functions.  Defs.' Cross-Mot. Summ. J. 11.  And it emphasizes that ALJs do not wield policymaking and enforcement authority, meaning they can be protected from removal.  Defs.' Cross-Mot. Summ. J. 14.  It insists that ALJs are less powerful than the PCAOB, as the ALJs are "subject at all times to [the NLRB's] authority to set policy," given an "ALJ's order is never itself a final agency disposition."  Defs.' Cross-Mot. Summ. J. 11.  The NLRB also notes that it can adjudicate cases on its own if it chooses, without involving ALJs.  Defs.' Cross-Mot. Summ. J. 14 (citing 29 U.S.C. § 160(b)).  Finally, the NLRB points out that the removal restrictions for ALJs are less onerous than that of PCAOB members, as the former are removable for "good cause" and the latter could be removed only for "willful violations" of laws and regulations.  *See* Defs.' Cross-Mot. Summ. J. 10, 13.  These distinctions, according to the NLRB, eliminate the constitutional concerns with the ALJs' tenure protections.

It is true that this case presents a closer question than *Free Enterprise Fund*.  ALJs differ in important respects from PCAOB members.  Still, the Court is unconvinced that the distinctions allay the concerns at the heart of *Free Enterprise Fund*.

First, the NLRB is mistaken in claiming that adjudicative officers are categorically exempt from the *Free Enterprise Fund* rule.  To be sure, the *Free Enterprise Fund* holding explicitly did not "address" ALJs.  *Free Enter. Fund*, 561 U.S. at 507 n.10.  And it remarked that "unlike members of the [PCAOB]," ALJs "perform adjudicative rather than enforcement or policymaking functions."  *Id.*  But a recognition of the issues not before the Court does only that.

It does not express any opinion on the merits of those unpresented questions. *Jarkesy*, 34 F.4th at 464 ("Far from stating that this may justify multiple layers of removal protection, the Court merely identified that its decision does not resolve the issue presented here.") (cleaned up).

More, in setting aside the ALJ issue, the Court noted that a critical question was (at the time) unsettled. *Free Enter. Fund*, 561 U.S. at 507 n.10. It pointed out that "[w]hether administrative law judges are necessarily 'Officers of the United States,'" as are PCAOB members, "[was] disputed." *Id.* So to the Court, the ALJ issue was premature. But this open question has since been closed.

ALJs are, in fact, executive officers. Like the SEC ALJs recently found to be inferior officers in *Lucia*, NLRB ALJs "conduct trials," as well as "administer oaths, rule on motions, and generally regulate the course of a hearing, as well as the conduct of parties and counsel." *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 248 (2018) (cleaned up); *see* 29 C.F.R. § 102.35. They also "rule on the admissibility of evidence [and] thus critically shape the administrative record." *Lucia*, 585 U.S. at 249; 29 C.F.R. § 102.35. And when no party files an exception to an ALJ order, "the ALJ's decision itself becomes final and is deemed the action of the [NLRB]." *Lucia*, 585 U.S. at 249; 29 C.F.R. § 102.48. *See also Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1103 (D.C. Cir. 2021) (holding Department of Agriculture ALJs are inferior officers); *Westrock Servs., Inc.*, 366 N.L.R.B. No. 157, slip op. at *1 ("Board judges, like SEC judges, are inferior officers[.]"). As Judge Rao persuasively explained, if ALJs are "officers" for purposes of the Appointments Clause, they must also be "officers" for purposes of the President's removal

power.  *See Fleming*, 987 F.3d at 1118 (Rao, J., dissenting in part).  With that piece of the puzzle in place, the applicability of *Free Enterprise Fund* to ALJs sharpens.

Next, the NLRB's argument that freewheeling ALJs are less of an affront to the executive power because they perform purely adjudicatory duties is myopic.  Sure, ALJs "conduct adjudications," an activity taking a "judicial form[]."  *City of Arlington v. Fed. Comms. Comm'n*, 569 U.S. 290, 304 n.4 (2013) (cleaned up).  But such a function is still an "exercise[] of—indeed, under our constitutional structure [it] *must* be [an] exercise[] of—the executive Power."  *Id.; see also Fleming*, 987 F.3d at 1121 (Rao, J., dissenting in part) ("[T]he Constitution does not separate functions, but powers.").

Interbranch commingling is not condoned by the Constitution.  If an officer is in the Executive Branch, he is wielding the executive power.  *See City of Arlington,* 569 U.S. at 304 n.4.  And despite appellations like "independent agency" and "administrative state," federal commissions reside in the Executive Branch.  *Freytag v. Comm'r*, 501 U.S. 868, 912 (Scalia, J., concurring in part) ("[T]he Tax Court, like the Internal Revenue Service, the FCC, and the NLRB, exercises executive power."); *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 773 (2002) (Breyer, J., dissenting) ("Although Members of this Court have referred to agencies as a 'fourth branch' of Government, the agencies, even 'independent' agencies, are more appropriately considered to be part of the Executive Branch.").  This is especially true of the NLRB, which "eschews notice-and-comment rulemaking" and relies on "policymaking by adjudication" to regulate parties.  Catherine L. Fisk & Deborah C. Malamud, *The NLRB in Administrative Law Exile: Problems With Its Structure and Function and Suggestions for*

*Reform*, 58 Duke L.J. 2013, 2018 (2009).  Thus the NLRB's desired dichotomy between "judicial" and "executive" collapses.

The NLRB also claims that *Free Enterprise Fund* does not control here because ALJs are less powerful than the PCAOB.  It insists that ALJs have purely recommendary powers because their orders must be separately enforced by an order of the NLRB.  But this undersells ALJs' authority.  True, an ALJ only issues a "recommendation" to the NLRB with her relevant factual and legal determinations.  29 C.F.R. § 102.45(a).  And any party can file timely "exceptions" to the ALJ's "decision or to any other part of the record or proceedings," in which case the NLRB will review the case itself.  29 C.F.R. § 102.48(b).  But ALJ orders *do* become final upon omission; if no timely exceptions are filed, "the findings, conclusions, and recommendations contained in the Administrative Law Judge's decision . . . automatically become the decision and order of the [NLRB]."  29 C.F.R. § 102.48(a); *see also* 29 U.S.C. § 160(c).  Thus in many cases, the ALJ has the final word.

Besides, even crediting the supervisory power of the NLRB, that does not render *Free Enterprise Fund* inapposite.  The SEC also oversees the PCAOB.  The SEC can "approve the [PCAOB]'s budget, issue binding regulations, relieve the [PCAOB] of authority, amend [PCAOB] sanctions, or enforce [PCAOB] rules on its own."  *Free Enter. Fund*, 561 U.S. at 504.  And the SEC must approve any rule promulgated by the PCAOB before it can take effect.  *Id.* at 528 (Breyer, J., dissenting).  Still, this control was not enough for the Court.  It emphasized that "[b]road power over [PCAOB] functions is not equivalent to the power to remove [PCAOB] members."  *Id.* at 504.  The same principle holds true here—the latent authority of the NLRB to

adopt or discard a recommended ALJ decision cannot diminish the severity of the constitutional impingement their tenure poses.

More still, ALJs possess various substantive powers that are carried out without NLRB intervention.  ALJs have the authority to fully manage cases under their purview.  They can, for example "grant applications for subpoenas," "rule upon offers of proof and receive relevant evidence," "take depositions," "dismiss complaints," and "take any other necessary action authorized by the [NLRB]'s published Rules and Regulations."  29 C.F.R. § 102.35.  So while ALJs may look a little different from the PCAOB members, they are still powerful actors in the Executive Branch.

But more importantly, the democratic diminution wrought by the PCAOB members' double-layer tenure did not rest on a line-by-line assessment of their duties.  The Court did not devise some rubric, exempting officers with a slate of duties below a certain threshold from the President's grasp.  Instead, the Court found the two-tiered design *itself* constitutionally odious. *Free Enter. Fund*, 561 U.S. at 496 ("A second level of tenure protection changes the nature of the President's review.").  The "novel structure" of double protection did "not merely add to the [PCAOB's] independence, but transform[ed] it." *Id.*  Thus the decision rested on the stacked job security.  The wide-ranging berth of the PCAOB's authority, coupled with its heightened tenure protections, only made those protections "an even *more* serious threat to executive control than an 'ordinary' dual for-cause standard." *Id.* at 502 (emphasis added).

So although ALJs have less authority than PCAOB members, the outcome remains the same.  Indeed, the bulk of the NLRB's arguments here are better suited for the question of whether ALJs are inferior officers at all, or rather mere employees.  But that issue has already been settled by *Lucia*, 585 U.S. at 248–49.  Because the ALJs are inferior officers, *Free*

*Enterprise Fund* instructs that they cannot be insulated by more than one level of job protection, full stop. In short: The precise horsepower of the bus is second to whether the bus is double-decker.

It follows that the distinction between the statutory tenure standards is beside the point. The coupled removal restrictions offend Article II, regardless of whether the inferior officer is only removable for "willful violations" of the governing statute or merely for "good cause." *Free Enter. Fund*, 561 U.S. at 503; 5 U.S.C. § 7521(a). Either way, that officer is tucked snugly under two obstructions to the President's control. *See Collins v. Yellen*, 594 U.S. 220, 256 (2021) (cleaned up) ("[T]he Constitution prohibits even modest restrictions" on the President's removal power.).

This Court is not the first to consider these questions. On one side of the ALJ removal issue lies the Fifth Circuit, which has found that the tenure protections for SEC ALJs, which are comparable to those of the NLRB ALJs, are unconstitutional. *Jarkesy*, 34 F.4th at 463–65. On the other side are the Sixth, Ninth, and Tenth Circuits. In *Calcutt v. Federal Deposit Insurance Corporation*, the Sixth Circuit held that FDIC ALJs could constitutionally enjoy multiple layers of removal restrictions. 37 F.4th 293, 318 (6th Cir. 2022), *rev'd on other grounds*, 598 U.S. 623 (2023) (per curiam). It reasoned that "the *Free Enterprise Fund* exception for ALJs centers on their status as adjudicatory officials that issue non-final recommendations to an agency, and not on how many levels of removal protections they enjoy." *Id.* at 320. To the Sixth Circuit, because ALJs perform adjudicatory functions, file recommendations subject to FDIC review, and are not statutorily required for agencies to use, they can be dually insulated from removal. *Id.* at 319. The Ninth and Tenth Circuits agree. *See Decker Coal Company v. Pehringer*, 8 F.4th 1123, 1136 (9th Cir. 2021) (Department of Labor ALJs); *Rabadi v. U.S. Drug Enf't Admin.*, ---

F.4th ---, 2024 WL 4899531, at *3 (9th Cir. 2024) (Drug Enforcement Administration ALJs);[2]
*Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 763 (10th Cir. 2024)
(Consumer Product Safety Commission ALJs).

The Court agrees with the Fifth Circuit and disagrees with the Sixth, Ninth, and Tenth.
From this Court's perspective, the Ninth and Tenth Circuits placed too much weight on the
adjudicatory "functions" of the ALJs.  In doing so, they ignored the fact that these ALJs were
nonetheless exerting executive power, case by case.  This Court also disagrees with their focus
on the agencies' ability to bypass ALJs altogether and adjudicate cases on their own.  *See Free
Enter. Fund*, 561 U.S. at 504 ("The [SEC] cannot wield a free hand to supervise individual
members if it must destroy the [PCAOB] in order to fix it.").  That leaves the Sixth Circuit's
opinion, which was unanimously reversed by the Supreme Court, although on other grounds.
That is a tenuous reed to sustain the NLRB's position.

*Free Enterprise Fund* was clear in its admonition:  Officers of the United States cannot
be insulated from the removal power by two or more levels of decisionmakers who themselves
enjoy job protection.  To find otherwise would poison the soil of Article II and choke off
accountability to the President.  The removal restrictions are unconstitutional.

**IV.**

That raises the question of remedy.  Saint Vincent has asked for declaratory judgment.
Compl. 15.  While the NLRB argues that Saint Vincent must show tangible harm traceable to the
removal restrictions to be entitled to relief, that requirement does not logically extend to
declaratory relief.  *But cf. Collins*, 594 U.S. at 259 (requiring a showing of compensable harm

---

[2] In both Ninth Circuit cases, the ALJs were less insulated from presidential removal than are the NLRB ALJs, as
they were overseen by principal officers who could be terminated at will.  *Decker Coal*, 8 F.4th at 1134–35; *Rabadi*,
2024 WL 4899531, at *3.

traceable to an officer's unlawful removal restrictions to obtain a reversal of the officer's order). Saint Vincent does not seek to "regard . . . the actions taken by the [NLRB] . . . as void." *Id.* at 257. Instead, it requests a declaration that the ALJs are unconstitutionally insulated from removal. Whether such a declaration is propitious does not turn on the effect of a purported statute that was "never really part of the body of governing law" to begin with. *Id.* at 259. Instead, it is the vehicle by which a party asserts that the statute is "displace[d]" by the Constitution. *Id; see Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022) (explaining that "[a] party challenging an agency's *past actions* must . . . show how the unconstitutional removal provision actually harmed the party") (emphasis added). So the Court need not find that the removal restriction actually inflicted harm to grant declaratory relief. *Cf. Cochran v. U.S. Sec. & Exch. Comm'n*, 20 F.4th 194, 210 (5th Cir. 2021), *aff'd and remanded sub nom. Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175 (2023) (holding the *Collins* compensable harm inquiry did not apply to the case before it because the plaintiff "d[id] not seek to 'void' the acts of any SEC official.").

But there is still one more problem: if it is the *combination* of the removal restrictions that offends the Constitution, which layer goes? *Free Enterprise Fund* instructs that the Constitution displaces the bottom-layer removal restriction. *Free Enter. Fund*, 561 U.S. at 509 (severing removal restrictions for PCAOB members). But here, there are arguably two bottom layers—the ALJ is protected from removal by NLRB action and an MSPB determination. So it is a stickier question.

The NLRB suggests cutting out the MSPB but restricting the NLRB to removing its ALJs for "good cause." Defs.' Cross-Mot. Summ. J. at 33. Under the NLRB's suggested approach, a terminated ALJ could appeal that "good cause" determination in district court. *Id.* But the Court

does not think that proposal solves the constitutional dilemma.[3]  If the Court were to adopt the

NLRB's suggestion, the agency still could not remove its ALJs at will.  So while the MSPB layer

would go away, the NLRB layer would remain.  That structure is simply a rehash of what *Free*

*Enterprise Fund* condemned.  This will not do.

      The Court thinks the sounder solution is to recognize that the ALJs are removable at will

by the NLRB, the agency that appoints them.  *See Free Enter. Fund*, 561 U.S. at 509; 5 U.S.C.

§ 3105.  That means 5 U.S.C. § 7521(a) must simply read: "An action may be taken against an

administrative law judge . . . by the agency in which the administrative law judge is employed."

The rest of the subsection—"only for good cause established and determined by the Merit

Systems Protection Board on the record after opportunity for hearing before the Board"—is

repugnant to the Constitution and therefore inoperative as applied to NLRB ALJs.  5 U.S.C.

§ 7521(a); *see also* William Baude, *Severability First Principles*, 109 Va. L. Rev. 1, 8–9, 18

(2023).  This remedy "leaves the [ALJs] removable by the [NLRB] at will, and leaves the

President separated from [ALJs] by only a single level" of tenure.  *Free Enter. Fund*, 561 U.S. at

509.  Thus the NLRB is "fully responsible for the [ALJ's] actions, which are no less subject than

the [NLRB's] own functions to Presidential oversight."  *Id.*

      This remedy is also proper if the Court employs a severability analysis, as the MSPB

review provision is severable from the rest of the statute—the Administrative Procedure Act.

*Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) ("A court should refrain from

invalidating more of the statute than is necessary. . . . Whenever an act of Congress contains

unobjectionable provisions separable from those found to be unconstitutional, it is the duty of

this court to so declare, and to maintain the act in so far as it is valid.") (cleaned up).  Though the

---

[3] Saint Vincent does not offer a severance-like argument, focusing instead on its request for injunctive relief.  Pls.' Reply Br., ECF No. 20, at 21.

APA does not contain an express severability clause, it seems clear to the Court that "the remaining provisions are not incapable of functioning independently, and nothing in the statute's text or historical context makes it evident that Congress, faced with the limitations imposed by the Constitution, would have preferred" a complete overhaul of administrative law to ALJs without tenure protections. *Free Enter. Fund*, 561 U.S. at 509. Neither party has suggested otherwise. Thus the removal restrictions will be severed from the rest of the statute.

**V.**

For all these reasons, the NLRB ALJs' removal protections offend the Constitution. The executive power begets the authority to remove executive officers. But as *Free Enterprise Fund* recognized, that prerogative is unduly thwarted when it is conditional and fractured. Qualifiers like "adjudicatory" and "subordinate" cannot obviate the threat that multiple layers of tenure protections pose to the separation of powers. The Framers envisioned a second branch accountable not only to the President but—much more importantly—to the American people. This holding protects that venerable ambition.

A separate order will issue.

Dated: December 10, 2024                    _____
                                            TREVOR N. McFADDEN, U.S.D.J.